McKinney, J.,
delivered the opinion of the Court.
The complainant seeks by this bill to be emancipated, by a decree of the Court of Chancery.
The right of freedom is based upon a supposed agreement alleged to have been made with him by Henry Sliger — his former owner. The allegation of the bill is, “that the said Henry, previous to his death, agreed with the said Isaac, that he should be free at the death of Elizabeth, (wife of said Henry,) in the event that he conducted himself properly up to the happening of that event.”
It appears that said Henry Sliger died in Washington county, in this State, in 1834. Immediately preceding his death, he duly made and published his last will and testament, whereby he devised and bequeathed all his property, both real and personal, to his widow during her life or widowhood, with remainder to his seven children. The widow died in 1855, upwards of twenty years after the death of her husband, without having made any provision for complainant’s emancipation; and an attempt being made, soon after her death, by some of the children of testator, to sell complainant, this bill was filed.
It appears that complainant lived with, and served his mistress, up to the time of her death. And although his treat *216 ment of her, and his general good conduct, are complained of by the defendants in their answers, we think that, other difficulties out of the way, the relief sought by complainant could not be successfully resisted on this ground.
The main question is, has the complainant established a legal right to freedom ?
The proof upon this point rests in the parol declarations of the testator. One witness proves that he heard the testator say, not long before his death, (“ when his will was read oyer, and witness ashed him if he had set his negro, Isaac, free, as he, Isaac," was not mentioned in the will,”) “ that he had left all to Betsy (his wife) during her life; and that Isaac was to serve her during her life, and at her death, she was to set him free, if he done well.” This witness had had frequent conversations with testator on this subject, on former occasions ; and had heard him say, (in the presence of Isaac,) “that he intended to set him free at his death ” — “ if Isaac would be as good as he had been.” Another witness heard the testator say, the evening he died, “ that he wanted his black boy, Isaac, set free, at the death of his wife, if he was a good hoy to her.” This was said to a neighbor who was present, in a conversation betiveen the testator and him, and in the expectation of approaching dissolution. A third witness heard the testator say, “that if Isaac was a good boy, he would free him.” This was, perhaps, some time before his death.
The foregoing is the substance of the evidence; and this., it is assumed for the complainant, furnishes sufficient evidence of a valid contract between Sliger and complainant, entitling the latter to freedom. This is a mistaken assumption. The proof establishes no contract. We need not stop to discuss the validity of a contract entered into directly between master and slave, for the freedom of the latter. It is settled by our Courts, that such a contract — upon a consideration moving either from the slave, or from a stranger on behalf of the slave —is valid and obligatory. 8 Hum., 185. The proof shows, that the master entertained different purposes and intentions in regard to the emancipation of complainant, at different *217 times. His first intention was, to free him at bis own death, if be continued to be a dutiful servant. But nothing was done in execution of this purpose; and it was afterwards abandoned. It was at most a mere voluntary declaration or promise, which imposed no obligation on the master, nor did it confer any right on the slave. And had it even assumed the form of an agreement between the master and slave, whatever might have been its obligation in foro conscientice, in contemplation of law, it must be regarded a nudum pactum.
The will, which was made, perhaps, on the day preceding the death of testator, demonstrates that his intention then was, that the complainant should remain in the condition of slavery. And this leads us to consider the force and effect to be given to the parol declaration made after the execution of the will— “ that Isaac was to serve her (the widow) during her life, and at her death, she was to set him free, if he done well.” Did this declaration create a trust in favor of the slave ?
It is unquestionably true, that as the will was inoperative until after the testator’s death, and the title to the slave still in him, he might, after the execution of the will, have sold or disposed of the slave in any manner authorized by law; and this would have been a revocation of the will pro tanto. He might, after the will, have conferred on the slave, by parol declaration, a present right of freedom; and this would likewise have been, to that extent, a revocation of the will. So, he might, subsequent to the making of the will, have stipulated with his wife that she should emancipate the slave, or that he should be free at her death, and in this mode have created a valid parol trust in favor of the slave, which would likewise have been a partial revocation of the will. See Hill on Trustees, (2 Am. Ed.,) 69, et. seq. But none of these things were done. It does not appear that, after the execution of the will, the testator communicated to his wife, directly or indirectly, any wish or intention that the slave, Isaac, should be emancipated at any time, or that he enjoined any duty upon her, touching the emancipation of said slave, nor does it ap *218 pear that she had any knowledge that such parol declarations had been made by the testator.
It is clear, therefore, that these declarations do not affect the conscience of the legatee, nor do they create a trust in favor of the slave.
The widow, if so disposed, could not, as against the owners of the remainder interest, have emancipated the complainant. And it is equally clear, that these declarations, after the will, so far from being evidence of any intention on the part of the master, by his own act, to confer upon his slave a present right of freedom, are demonstrative of the very contrary intention.
We feel constrained, therefore, to reverse the decree, and dismiss the bill;